Good morning, Your Honor. May it please the Court, my name is Jiang Xinzhen. Together with Melinda Torres and Evangeline Abreu, we represent appellant David Lopez-Alvarenga. I'm going to argue that substantial evidence does not support an adverse credibility finding. My co-counsel, Ms. Torres, is going to argue that the agency's denial of conviction against torture is also erroneous. Each of us will speak for six minutes, and we would like to reserve three minutes for rebuttal. We are here today because a young man with limited resources and with limited English-speaking ability submitted his statements under severe restraints caused by detention, which led the IGH to believe there were inconsistencies. However, Ms. Lopez deserves fair consideration, not condemnation. We ask this Court to reverse BIA's decision because substantial evidence does not support an adverse credibility finding of Mr. Lopez. Instead, the records compel the conclusion to the contrary. We have already addressed the IGH's errors in our briefs, and I would like to focus on the following three points. To my first point, the IGHs believe that it is impossible that Mr. Lopez did not know his teardrop tattoo was gun-related. It is based on impermissible speculation and failed to consider Mr. Lopez's reasonable explanation, which means the IGH made two errors here. First, the IGH had accepted Mr. Lopez's testimony that he is not a gang member, either in El Salvador or here in the U.S. Thus, the IGH could not have expected Mr. Lopez to know the meaning of the teardrop tattoo without pointing to the specific evidence in the record. Second, the IGH ignores Mr. Lopez's reasonable explanation with the meaning of the teardrop tattoo in his opinion. Mr. Lopez explained in the hearing that he got the tattoo because of his brothers passing away. According to the case IJUNJI v. Holder, an IJ must consider and address a non-citizen's plausible and reasonable explanation for the basis of an adverse credibility finding. The IJ here, in our case, made an error by failing to consider it. So, counsel, let me jump in right here because I'm going to anticipate what government counsels are going to say. They're going to say, you know what, your reading of the evidence could be right, but the IJ's reading also could be right. And if it's like this, 50-50, under the standard of review, the government wins. Tell me why, assuming that's the correct standard, why is it not 50-50 in this case? You have your version, they have their version, therefore, they win. Why is that wrong? Well, Your Honor, I would like to point out that they are wrong because, first, this is not a question of fact. Actually, instead, this is a question of law. Thus, this Court should review this issue de novo. Second, as I just pointed out in the case IJUNJI v. Holder, this Court held that the IJ must consider and address a non-citizen's plausible explanation. However, in IJ's opinion, he does not address Ms. Lopez's reasonable explanation for the teardrop tattoo. But we have more than a teardrop tattoo in this case. That's one. I think that's your best argument. There are some other ones that are more difficult, whether he was attacked one time or two times, or whether there was a gun, or there wasn't a gun, or the gun was pointed. And I know that's where they're going in this case. So tell me why, when they go there, they're wrong. Your Honor, that's my following argument. To my second point, the IJ's finding of an inconsistency regarding the number of beatings Mr. Lopez endured is erroneous, because his court testimony is consistent with his statement in the credible fear interview and the declaration. Whenever Mr. Lopez gave the statement on his own, he said he was beaten once, for example, in his credible fear interview, in his court testimony, and even in his declaration. The only time he has to rely on someone else, which was in his asylum application, he said he was beaten twice. And he gave a very... But he gave different dates. I mean, that was one of the things the IJ noticed. It wasn't just I was once beaten twice. There were actually dates given, so there was an additional detail. So why isn't that something that the IJ can latch onto reasonably in sorting this out? Because the standard here is, would every reasonable adjudicator be compelled to resolve it the way you say? Your Honor, so Mr. Lopez, for the only time he gave he was beaten twice. That was in his asylum application. And Mr. Lopez gave a reasonable explanation for that. He is the person who was helping me copy it into English, misunderstood me, and understood that I meant two times. And also, there's a signature in the asylum application that Jose Delgadillo helped Mr. Lopez to fill in the asylum application. And at the same time, Your Honor, the declaration is really stating that all the beatings happened in one day, in one occasion. Because if a reasonable person would want to indicate that two incidents happened in two days, he must use the word one day, the other. However, in this declaration, he only used the word one day, and then he say beat me again at this time. Thus, this court, this declaration is really stating that he was beaten once. We ask this court to read the declaration. It's consistent with his court testimony as the court did in the Harry Parton v. Holder. And the declaration, and don't worry about the time. You're not going to steal your partner's time. Thank you. The declaration you're referring to, is that 1093 to 1094? That is true, Your Honor. Okay. Do you have any more? I'll give you a little more time. Do you have any more points you want to wrap up with? Oh, yeah, Your Honor. So last but not least, even we assume that one or two of the cases the I.G. relied on were valid, we ask this court to remand this case as the court did in Kumar v. Garland, because we cannot tell whether the I.G. would have still found adverse credibility based on the one or two remaining cases. Thank you, Your Honor. Thank you very much, Counsel. All right. We'll hear for the next. And just to make things easier, we're going to give you six, and then I'm going to give you guys three for rebuttal. Okay, so you can go ahead and you say, and Governor Counsel, don't worry, you'll have enough time. Good morning, Your Honors, and may it please the court. My name is Melina Torres. For the past decade, Mr. Lopez Alvarenga has faced the uncertainty of whether he will be able to remain under the protection of this country. What he does feel is certain, however, is the fact that he will face torture from the Salvadoran government and gangs if he is denied the opportunity to remain. Your Honors, this court does not allow a negative credibility determination to wash over a torture claim, especially when the agency has failed to consider relevant country conditions evidenced from the record. While we point out several pieces of evidence that the immigration judge and agency failed to consider, today I'll be focusing on three critical pieces of evidence. First, evidence of the death certificates of Mr. Lopez's friends. Second, relevant evidence of torture in the country conditions reports. And third, evidence that the passage of time does not undermine Mr. Lopez's likelihood of harm. First, the immigration judge failed to consider the death certificates of Mr. Lopez's friends. In his declaration, Mr. Lopez stated that four of his friends, whom are like brothers to him, were killed by the gangs. Mr. Lopez provided the death certificates of two of these friends, which indicate that they died of asphyxia by suffocation and beheading. Despite this critical piece of evidence that the gang members had harmed persons close to Mr. Lopez, neither the immigration judge nor the agency made any mention of the deaths in their decisions, and they made no questions to develop the record further on the matter. Well, I mean, our case authority says that they do not have to exhaustively tick through every item of evidence. So that's one point. And then IJ, clearly, you can carry over with respect to person-specific information and adverse credibility determination and say, you're still not believable even when we get to the torture claim. Now, that may not deal with the country conditions, but it may affect items of evidence like this. So why isn't that an adequate grounds for upholding the agency's analysis of this evidence that you're pointing to? Yes, Your Honor. To your first point, it is true that the immigration judge does not need to specifically list every piece of evidence in the record. However, issues do arise when the immigration judge fails to consider highly probative or potentially dispositive evidence in the record. And this Court has held in Navarrete-Gonzalez v. Garland that evidence of the petitioner's close friends and family members getting killed by the Salvadoran gang was highly probative evidence that the agency failed to consider. And while it is true that when it comes to adverse credibility, you know, testimony or stuff that's related to the petitioner can also affect the torture claim, here we have more than just testimony from Mr. Lopez. We also have the death certificates, which is that objective evidence that goes beyond the testimony. That objective evidence itself is separate from the testimony that would affect his adverse credibility finding. And that is also what we're contending here, Your Honor, that the immigration judge failed to further probe into this record. This error is even more critical considering the immigration judge's obligation to develop the record for a pro se respondent, a standard that this Court established in Aguiman v. INS. The next critical evidence that the immigration judge failed to consider was relevant country conditions evidence of torture from the Salvadoran government and gangs. The immigration judge relied on evidence of deaths in prisons to establish the likelihood of torture from the government, but failed to mention other evidence of torture in his decision. For example, in Dr. McNamara's expert declaration, he specifically states, it would be extremely dangerous for individuals with criminal histories. Sotomayor, what page are you on from the declaration? Oh, this is AR-208, Your Honor, Dr. McNamara's declaration. It would be extremely dangerous for individuals with criminal histories, former gang membership, and or tattoos to be deported back to El Salvador because each group would face a greater than 50 percent chance of torture under the current conditions. Mr. Lopez does not only fall into one group here. He falls into at least two because of his criminal convictions and tattoos. That statement that directly suggests that Mr. Lopez would be subject to more than a 50 percent chance of likelihood of torture is something that the government did not consider or, I'm sorry, the immigration judge did not consider. The immigration judge states in AR-49 that Dr. McNamara's factual findings do not suggest it would be more likely than not for Mr. Lopez to be tortured. Dr. McNamara's statement regarding Mr. Lopez's or individuals in Mr. Lopez's position, likelihood of torture is corroborated by other evidence in the record. The record is repleted with evidence of torture of individuals with deportees and criminal convictions. I would like to provide just a few. Beginning in AR-640, there's case profiles of males in his age group getting tortured and even killed just for having tattoos and being suspected gang members. What's your response to the, I mean it's a bit of a sort of gruesome math, but the IJs said, you know, if you look at the percentage of people who actually are getting killed in the Salvadoran prisons, it's, you know, it's not that high and nowhere near 50 percent so therefore I can conclude it's not greater than 50 percent that he's going to suffer that kind of mistreatment. What's your, why is that wrong in your view? Your Honor, that calculation of the number of deaths is not the definition of torture that we're bound by under the Convention Against Torture. Torture is defined as any act of severe pain or suffering, so using the number of deaths to calculate the likelihood of torture is not an accurate representation. But torture is an extreme concept. It's even more extreme than persecution and not, you know, a beating in prison may not qualify as torture. Yes, you're right, Your Honor. However, the record does indicate that there are extreme instances of torture. And I see I'm running out of time, but I do want to provide some examples of extreme amounts of torture occurring in prisons. For example, AR-364 shows clear patterns of torture in prisons. What page? 3R-6, 364. 364. And 371, lethal prison conditions and food rations being cut. Okay. I just have one final question. Are you familiar with the Gutierrez case from last July from this Court? I don't believe so, Your Honor. Okay. All right. Thank you, Counsel. You'll have the three minutes for rebuttal. All right. Thank you, Your Honor. Good morning, Your Honor. May it please the Court? Dan Goldman on behalf of the Attorney General. The government asked this Court to uphold the agency decision and deny the petition for review. There are two issues that, as was discussed, the adverse credibility finding, which is dispositive of the asylum and withholding claim, and then the merits of the CAT claim, because the immigration judge presumes that Mr. Lopez Alvarenga is credible when he's evaluating the CAT claim. In this case, substantial evidence more than supports the adverse credibility finding. There are multiple discrepancies. The discrepancies are irreconcilable. Number one, the number of beatings in this case. Number two, whether there was a gun involved in the beatings or the incidents with the gang. Number three, the level of harm, whether Mr. Lopez Alvarenga had to get medical treatment. And then number four, as was discussed substantially earlier, the implausibility of his statement that the teardrop tattoo that he got after he came to the United States, after he got involved with the criminal justice system in the United States, and with his background, according to him, dealing with gangs, a cousin who was in a gang, the implausibility of suggesting that he had no idea that that could be interpreted as a gang tattoo. I would take issue with some of what Petitioner's counsel suggested, that the immigration judge used his own knowledge or somehow came up on his own with the idea that this is a gang-related tattoo. Not the case. In this situation, it was Mr. Lopez Alvarenga, I believe it's AR-149, who says this is commonly seen as a gang-related tattoo. It's Mr. Lopez Alvarenga's own words that are used against him, not the immigration judge's speculation. The suggestion, it was raised again today, it was raised a couple days ago in the 28-J letter, with regard to the suggestion that the immigration judge somehow didn't consider Mr. Lopez Alvarenga's explanation. Again, not accurate in this case. It's right there in the record, AR-62, the immigration judge specifically considers Mr. Lopez Alvarenga's explanation. He doesn't agree with it. He doesn't find it persuasive. But he specifically notes the explanation, that he got the tattoo in memory or in honor of his brother. The immigration judge says, no, given your background, your experience as a teen in your country that you testified to dealing with gangs, I do not find that explanation credible or plausible, which contributes to the adverse credibility finding here. Second, I wanted to address the discussion with regard to the declaration and what it says or doesn't say. The suggestion in the 28-J letter, the suggestion today, is that somehow Mr. Lopez Alvarenga's declaration, when he says he was beaten again and then refers to this time, referring to the second incident, that, no, it's not two incidents. The suggestion is, as the Petitioner's counsel stated in their letter, that it was one extended beating. As Your Honor noted earlier, perhaps, perhaps that's one way to read what Mr. Lopez Alvarenga wrote and what he submitted to the immigration court with the assistance of counsel. Government takes issue with their suggestion that a reasonable read would suggest that it was one extended beating. If nothing else, government urges the court to look at the exact words that he chose to use. He says he's on his way home from school when he is stopped and he is beaten. He's warned, don't go back to school. And then he says, I decided to go back to school. So on the way back to school, or he says there's a consequence to going back to school, he is beaten. So in order for Petitioner's counsel's suggestion that this was one extended beating, in order for that to be the case, they had to beat him on the way home, wait for him, I suppose, then beat him on the way back, and we're going to call that one extended beating. The government takes issue with that suggested interpretation. And if nothing else, as Your Honor noted, the standard review here is substantial evidence. The suggestion, well, maybe it could be this, maybe it could be that, maybe it could be the other thing, does not meet their burden under the substantial evidence standard of review. For those reasons, the government urges this court to uphold the adverse credibility finding, which is dispositive of the asylum and withholding claims. With regard to Catt, as the immigration judge noted, and it was discussed earlier, there is evidence of the bad conditions and the overcrowding and even... I want to ask you about one thing that you said, which is, you said for purposes of the torture convention claim that the ALJ took the evidence as true. I read the ALJ as taking it as true in the alternative, because what it says on page 11 of the decision, it says the respondent was beaten once by gangs in El Salvador. It was a brief beating of about ten minutes with hands and fists. And that's if the respondent's testimony is to be believed. Again, the court did not find that the respondent, the court did find that the respondent was not a credible witness. However, even assuming the respondent's testimony is accurate, and then goes on. So that seemed to me to be, on the one hand, I don't believe the stuff he claims about his own circumstances. So I stand on that. But even if it's true then, that's how I read it. Am I wrong? I would never say no to that, Your Honor. No, we make mistakes. That's why we have arguments. I guess a couple points there, Your Honor. Number one, the government would not be, would not object to that interpretation. Our defense in our brief was based on a credible, presuming him credible. And even if he is determined to be not credible, he can still meet his burden before the immigration court with objective evidence that's not tainted by the adverse credibility finding. I can think of at least one case where we've held someone was a complete liar, but he still actually faced an objective risk of torture because he was a member of a group that was being persecuted by the government in power. Right. And so I think in either case, Your Honor, the court should deny the petition if he was not credible. And we noted this in our brief, that the immigration judge, the board, could have rejected the Catt claim. But the credibility would just take out the individual circumstances. That's correct. Then you have to deal with the general country conditions. And does that suggest he's going to end up in a situation where he'd be tortured? That's correct, Your Honor. But he still has to make an individualized, a particularized showing. And that's where his claim fails. Even setting aside the credibility finding, as the immigration judge explains, the immigration judge considers the expert declaration. The immigration judge considers the State Department report, the country conditions evidence, and recognizes there are tens of... Is it really true, as the ALG seem to say, you know, in El Salvador, they only torture and kill 20 percent of the prisoners. And so that's not more than 50 percent. So back you go. Is that really what the standard is? The standard is more likely than not, to try and answer your question directly. It's kind of a crude math, but is that really what the law is? The law is, he has to prove more likely than not, before the immigration court, that he would be facing an individualized risk of torture. Before this court, he has to prove that the evidence compels reversal of the findings below. In this case... Well, I think, if I might interrupt, part of their major argument isn't that the evidence compels the different conclusion. Their argument is the IJ did not consider or discuss the relevant evidence. And in particular, the IJ does rely on the statistical evidence with respect to death in prison, but doesn't discuss torture, which is a major part of his claim. And there is evidence in the record that people who are suspected gang members are tortured in prison. So why shouldn't we send it back and let the ALJ sort that out? A couple of points in response, Your Honor. The court should not send this case back because the immigration judge did consider all the evidence. There's no indication in this case that the immigration judge stuck his head in the sand and said, I don't even think you're going to get arrested. The immigration judge recognized that... He said the immigration judge basically conceded that he could be arrested just based on his tattoo. And then he went on to say, well, people statistically aren't dying that much in prison, but I don't see a discussion of the torture claims. Your Honor, again, a couple of points there. The immigration judge recognized, number one, that the danger to Mr. Lopez Alvarenga comes from the tattoo that he, that Mr. Lopez Alvarenga admits looks like a gang tattoo, would be seen as a gang-related tattoo, which he got after he came to the United States. The immigration judge also recognizes Mr. Lopez Alvarenga's criminal record in the United States could subject him to different treatment. Bears noting that Mr. Lopez Alvarenga's claim gets stronger as he stays in the United States. When he came to the United States, according to him, he wasn't gang affiliated. He didn't have a gang, what looked like a gang tattoo. He didn't have a criminal record. This is not the case where an individual comes to the United States, has an encounter with law enforcement, and ICE then puts them into deportation or removal proceedings. Mr. Lopez Alvarenga was in removal proceedings. So at a time that he was asking to stay in the United States, he went out and committed crimes, as was fully detailed in our brief. He's got a pretty substantial criminal record. So I agree with you on that. But the question is, under the cat claim, is he going to suffer? Is he likely to suffer torture in prison if he's arrested either because of his criminal record or his tattoo? And I want to clarify, Your Honor, the government is not advocating that this court adopt a statistical analysis. We're not suggesting that an immigration judge should be required to say you've got a 16 percent likelihood based on this, 14 on this, 13 on this. And if my math is right, that adds up to something in the 30s or 40s. Therefore, you lose. Absolutely not what we're suggesting. What we are suggesting, what we argued in our brief, and what the immigration judge here did was looking at the numbers. And you look at those numbers and it's staggering when you see numbers like 20, 40, 60, 70,000 people incarcerated under the state of emergency, the state of exception in El Salvador. And then you hear there is abuse, there is torture, there is death in the prisons. What the immigration judge here did and what the statistical, the numbers look suggests is even if there are, as was discussed, hundreds of cases, hundreds of cases, that is still a tiny fraction of that 50, 60, 70,000 people who are incarcerated. There's also evidence in the evidence in this case is not particularized as the immigration judge recognized. The declaration, the expert declaration that Petitioner's counsel was talking about is what they called a universal declaration. Yes, he offers an opinion, but the immigration judge makes it very clear that this declaration is not about Mr. Lopez Alvarenga's case. He says that it is not tailored to Mr. Lopez Alvarenga. That's why he did not meet his burden to show the required individualized risk. And this, and the decision from the immigration judge in this case upheld by the board is consistent with this Court's jurisprudence, both published and unpublished. But the I.J. seemed to consider individualized risk in recognizing that his tattoo would subject him to arrest and his criminal record. I mean, that's the individualized portion of the case. I agree with you on the declaration. The declaration is not individualized. The immigration judge, I think, had to take that into account. That, and we would agree, Your Honor, the immigration judge did look at that. That undercuts the argument made from Petitioner's counsel today that somehow the immigration judge didn't look at the evidence, didn't consider all the evidence that he was supposed to. There are decisions from this Court, both unpublished and published. Gutierrez's decision was noted. There are other unpublished decisions where this Court has said for someone who is not gang-affiliated, even if with a tattoo or with a criminal record, if the criminal record is not gang-affiliated, and according to Mr. And even with a tattoo that might look like a gang tattoo, which he admits, even with those situations, the evidence doesn't support the finding of an individualized risk of torture. That's why his claim fails here. If there were evidence of a particularized risk of torture, he could have submitted it. The evidence that was recounted today is general. It's not particularized to Mr. Lopez-Alvarenga. If he has that kind of evidence, there are options for him. He can file a motion to reopen with the board. It would be untimely at this point, but at least it would give him the opportunity to say, here's the missing piece. This is the convention against torture. Not trying to be facetious, but it's not the convention against overcrowded prisons or bad prison conditions or even abuse in prisons. He has to show, had to show before the immigration court, more likely than not that he would be tortured. He didn't do that, and he does not meet his burden before this Court to show the evidence compels reversal. Subject to the Court's questions, the government would ask the Court to deny the petition. Roberts. Thank you, counsel. Thank you, Your Honor. Thank you, Your Honor. I'd like to focus on the point that counsel is still focusing on the number of deaths to calculate the number of torture and pointing out that there's hundreds out of a thousand cases. The government is focusing on the number of deaths. As I mentioned earlier, this is not the standard for proving likelihood of torture under the Convention against Torture. And the problem here is... ALJ relied on number of deaths because that was what the statistics that were in the evidence submitted. Were there comparable statistics in the evidence submitted on rates of torture? Not quite, Your Honor. But the problem here is that the immigration judge did not consider the evidence of torture in the record. The immigration judge just relied on the number of deaths rather than the overall evidence of torture. And as I mentioned, statistical evidence is not required for proving the likelihood of torture under Convention against Torture. While it would certainly help, it's not required to prove that individualized risk. Here, there is that individualized risk because, as the expert declaration mentions, those individuals who have tattoos, criminal records, and tattoos and deportees have that more than 50% likelihood of torture. And that is a direct statement from Dr. McNamara that the immigration judge did not consider. And also, I would like to mention, this Court should review this under de novo because of the legal error here and the immigration judge's failure to consider the evidence of torture, not just substantial evidence. Also, I would just really like to emphasize that his credibility determination has, while it might have some bearing on his Convention against Torture claim, the objective evidence in the record still demonstrates that Mr. Lopez, because of his tattoos, his criminal records, and his status as a deportee, as the decree 717 indicates in the record, he is almost certainly going to get detained upon arrival to El Salvador. And once detained, the evidence in the record demonstrates that there's lethal prison conditions. He would be subject to torture. We are not bound to prove that he would be certainly tortured. We're just bound to prove that he is more likely than not. And here, we find that the record does demonstrate that Mr. Lopez would be more likely than not be bound, subject to torture in El Salvador. Thank you, Your Honors. All right. Thank you. I especially want to thank Santa Clara Law School. Professor, thank you so much for making this happen. You two are welcome in our Court anytime. Thank you very, very much. Fine work. This matter is submitted. We'll move on to the next one. But thank you, everybody.
judges: THOMAS, OWENS, COLLINS